UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Criminal No.: 23-CR-10041-AK |
| v. ) | |
| ) | |
| JEROME TURNER ) | |
| ) | |
| Defendant. ) | |

## MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO ORDER TRANSFER OF MR. TURNER FROM MDC BROOKLYN

The Defendant, Jermone Turner, moves to dismiss the Indictment or, in the alternative, for an order compelling the transfer of Mr. Turner to a more reasonably accessible detention facility within Massachusetts, Rhode Island, Connecticut, New Hampshire, or Maine. Mr. Turner is presently housed by the United States Marshal Service ("Marshal") at the Metropolitan Detention Center in Brooklyn, New York ("MDC Brooklyn"). This placement began upon his transfer from Bureau of Prisons ("BOP") custody back to a pretrial detention status after the Court found him restored to competency in April 2025.

MDC Brooklyn is more than 200 miles from the office of Mr. Turner's counsel in Boston, with typical round-trip travel times between 8-10 hours by car. This designation materially impacts Mr. Turner's right to counsel and ability to prepare for trial in this matter. Though such an assignment would ordinarily negatively impact these rights for any defendant, the inability to conduct meaningful in-person meetings substantially prejudices Mr. Turner in particular. Mr. Turner's mental capacity, as exhibited by the competency evaluation and restoration proceedings, makes it impossible to convey and discuss complex legal issues via telephone or video visitation (even assuming such visits completely comply with attorney-client confidentiality requirements). Defense counsel for Mr. Turner must take extra time and care to effectively communicate with

1

him and to ensure he is meaningfully engaging in the preparation of his defense, which simply cannot reasonably be done on the phone or on a short video call. These obstacles to accessing and communicating with Mr. Turner are not minor inconveniences. They are undermining Mr. Turner's right to effective assistance of counsel under the Sixth Amendment and to due process under the Fifth Amendment. Because Mr. Turner's constitutional rights have been violated, the indictment against him must be dismissed. If the Court declines to dismiss the indictment, Mr. Turner moves in the alternative for an order compelling the transfer of Mr. Turner to a detention facility within Massachusetts, Rhode Island, Connecticut, New Hampshire, or Maine.

## BACKGROUND

Mr. Turner is charged with Bank Robbery in violation of 18 U.S.C. §2113(a). ECF No. 10. The government alleges that on September 26, 2022, Mr. Turner entered a Brookline Bank location, handed the teller a note demanding money, and left with $3,125. The note was written on a pamphlet that the teller had given the robber approximately one hour previously when he inquired about opening an account at the bank. Brookline police identified Mr. Turner as a suspect, obtaining an arrest warrant from the Brookline court. Officers arrested him on September 27, 2022 after seeing him on a sidewalk in Brookline.

Mr. Turner made his initial appearance in this matter on January 31, 2023. ECF No. 7. At that time, he was still concurrently charged with this bank robbery in Brookline District Court. Mr. Turner displayed obvious competency concerns – when advised about his right to an attorney, Mr. Turner slowly and softly responded that he didn't understand; upon the Court repeating the question, Mr. Turner expressed again he didn't understand; throughout the proceeding he had a demonstrably blunted appearance. On this basis, the Court noted then "defendant may have a competency issue." *Id*.

On February 16, 2023, Mr. Turner entered federal custody exclusively following the dismissal of his Brookline state charges and the filing of the Indictment in this case. The Marshal lodged Mr. Turner at the Plymouth County Correctional Facility ("Plymouth"). The Court conducted an arraignment on February 28, 2023. ECF No. 17. His presentation and affect were similar to the initial appearance. Following this hearing, Mr. Turner returned to Plymouth. Counsel attempted to engage with Mr. Turner to discuss the case and obtain his historical records without success. Over the ensuing months his mental status dramatically declined further to the point where he was effectively non-verbal and remained in his cell underneath a blanket for large periods of time.

On August 1, 2023, counsel sought, and the Court entered, an order for a competency examination which was to be conducted locally at Plymouth given the delays associated with examinations performed in the Bureau of Prisons. The Court appointed Dr. Robert Mendoza to conduct the examination.

While Dr. Mendoza reviewed records in preparation for visiting Mr. Turner for an in-person evaluation, mental health clinicians at Plymouth became concerned about Mr. Turner's well-being and with the approval of the Marshal, transferred Mr. Turner to Bridgewater State Hospital pursuant to M.G.L. c. 123 s. 18(a).[1] He returned to Plymouth on September 21, 2023, after a Bridgewater evaluator determined that he did not meet commitment criteria for further involuntary psychiatric hospitalization and did not pose a substantial risk of harm to himself or others due to mental illness if housed in a correctional setting.

---

[1] That provision states, "If the person in charge of any place of detention within the commonwealth has reason to believe that a person confined therein is in need of hospitalization by reason of mental illness at a facility of the department or at the Bridgewater state hospital, he shall cause such prisoner to be examined at such place of detention by a physician or psychologist, designated by the department as qualified to perform such examination…"

3

Mr. Turner ultimately did not meaningfully participate in Dr. Mendoza's evaluation. Dr. Mendoza's report dated October 24, 2023, and provided to the Court under seal, contained a comprehensive review of Mr. Turner's history of evaluations and information about his confinement at Plymouth during the pendency of this case.

The Court conducted a competency hearing on November 3, 2023. Mr. Turner refused to be transported or participate in the hearing and the Court secured the assistance of staff at Plymouth to wheel a laptop with video-link to the proceedings to Mr. Turner's cell where he could be observed by the parties through the food port. ECF No. 52. At the conclusion of the hearing, the Court found by a preponderance of the evidence that Mr. Turner was presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to assist properly in his defense. *Id*. A written order of commitment to the custody of the Attorney General pursuant to 18 U.S.C. §4241(d) for competency restoration entered on November 9, 2023.

As of January 2023, Mr. Turner remained at Plymouth, with BOP personnel having determined that given his presentation, Mr. Turner required placement at a "Medical Referral Center." At the time, his projected arrival at a BOP facility was June 2024.

By May 2024, the Marshal began the process of transfer to that BOP facility, with Mr. Turner moving from Plymouth to the Donald W. Wyatt Detention Facility for that purpose. While filling out paperwork for his property before boarding the BOP bus at Wyatt on the morning of May 9, 2024, Mr. Turner inexplicably placed the pen he was using on the desk and struck the nearby correctional officer in the face. Other officers responded and restrained Mr. Turner. Ultimately, he left the facility on the BOP bus later that morning without further incident.

After in-transit transfers, Mr. Turner arrived at FMC-Butner on June 5, 2024. BOP calculated the commitment period's expiration as September 30, 2024. That period would be extended at the request of BOP and with the consent of the parties until October 21, 2024.

According to the BOP examiner's October 18, 2024 report, Mr. Turner began consistently accepting medication in September 2024. It appears from that report that Mr. Turner's consistent acceptance of medication occurred approximately one week following an incident report alleging Mr. Turner grabbed a female officer's buttocks while in the recreation area of his open unit.[2] In light of the improvements observed in Mr. Turner from his being medicated, the BOP examiner requested an additional 120-day period of commitment, believing there was a substantial probability that with continued medication compliance and restoration Mr. Turner could attain the capacity to proceed with trial. ECF No. 83. The parties agreed with the opinion of the examiner, and on October 30, 2024 the Court entered an order to that effect. *Id*.

As the period of expiration neared in February 2025, the BOP examiner offered a more guarded report via email but maintained her belief that Mr. Turner could be restored to competency with an additional period of commitment. ECF No. 87. The parties informed the Court that they agreement to an additional period of 60 days. ECF No. 84 at 2. The Court entered its order to that effect on February 25, 2025.

By early April 2025, Mr. Turner had indeed improved, and the BOP examiner opined he had retained competency. Counsel for Mr. Turner was able to speak with him briefly by phone from FMC-Butner and concluded there seemed to be no basis to dispute BOP's assessment in light of the competency threshold. In anticipation of a competency finding and Mr. Turner's return to

---

[2] Mr. Turner returned to a secure mental housing unit immediately afterwards and reportedly was found guilty of the violation but not competent and received no additional discipline.

5

Massachusetts, undersigned counsel contacted the medical department at Plymouth to confirm the facility would be able to accommodate the specifically prescribed medication BOP was administering to Mr. Turner. Medical staff at Plymouth promptly confirmed the medications could be administered at their facility, provided they were told of the date of his last injection. Thereafter, the BOP examiner confirmed the date of his last injection and noted that when Mr. Turner left the BOP facility, the Marshal would be provided with discharge paperwork for the receiving facility.

On April 22, 2025, Magistrate Judge Levenson entered an order finding that Mr. Turner had been restored to competency. ECF No. 92. That order included a directive to the U.S. Marshals Service that Mr. Turner be "returned promptly to this District." *Id*. Despite this order, Mr. Turner was not returned to this District. Instead, Mr. Turner was brought to MDC Brooklyn.

Mr. Turner had still not returned to Massachusetts by June 10, 2025. Counsel, believing that Mr. Turner's placement at MDC Brooklyn was in preparation for his return to Massachusetts, contacted the Marshal inquiring about an anticipated return date for Mr. Turner (believing that his apparent placement at MDC Brooklyn then reflected in the inmate locator was in preparation for his return). A deputy marshal replied that he was not going to be moving from MDC Brooklyn, stating, "Every facility in Massachusetts has refused to house him." When asked whether housing Mr. Turner in Hartford[3] was an option, the same deputy responded, "Unfortunately, he's staying where he is currently. We had to postpone him even arriving in district due to having no housing. He hasn't caused any commotion there and we hope it stays that way." Counsel directed additional inquiry with a senior marshal, specifically stating, "…I wanted to just make certain that MDC is the only solution here (i.e. Greenfield, Hartford, Strafford, Maine are likewise not willing to take

---

[3] Counsel previously had a different client with substantial mental health needs be housed at the Hartford Correctional Center after District of Massachusetts facilities refused to accept him.

him)," and received a reply noting, "…I can tell you that they exhausted all possible D/MA placements as he would certainly be in closer proximity if it was an option. We don't prefer to have anyone housed in Brooklyn, as it creates an operational burden when we have to get them to Court for hearings."

More recent communications with the Marshal initiated by the government following the parties' last status conference with the court resulted in a deputy continuing to confirm, "…Wyatt, and Plymouth refused him…MDC Brooklyn agreed to take him despite his assaultive past, so we put him there."

Mr. Turner presently indicates to counsel his desire to proceed to trial in this matter. Given counsel's leave schedule and other obligations, he has been unable to meet with Mr. Turner in person in Brooklyn to review the evidence and possible defenses as well as the expected sentencing consequences of conviction[4].

## ARGUMENT

I. **The indictment should be dismissed because Mr. Turner's Fifth Amendment right to due process and his Sixth Amendment right to effective assistance of counsel have been violated.**

The Federal Rules of Criminal Procedure state that a defendant may "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). "An indictment, or a portion thereof, may be dismissed [upon a defendant's motion] if it is otherwise defective or subject to a defense that may be decided solely on issues of law." *United States v. Mubayyid*, 476 F. Supp. 2d 46, 50 (D. Mass. 2007). In considering a motion to dismiss an indictment, the Court assumes all facts in the indictment to be true and views all facts in the light most favorable to the government. *Id*.

---

[4] It appears that Mr. Turner may be a Career Offender if convicted.

The Supreme Court has recognized that federal courts may exercise their supervisory powers to grant a motion to dismiss the indictment. A district court may dismiss an indictment under its inherent supervisory powers under the following circumstances: "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct." *United States v. Struckman*, 611 F.3d 560, 574 (9th Cir. 2010); *see also United States v. Hasting*, 461 U.S. 499, 505 (1983). Although this power must be used "sparingly," *United States v. Castillo*, 537 F. Supp. 3d 120, 130 (D. Mass. 2021) (citing *United States v. Santana*, 6 F.3d 1, 10 (1st Cir. 1993)), the dismissal of charges "'is appropriate when the investigatory or prosecutorial process has violated a federal constitutional or statutory right and no lesser remedial action is available.'" *United States v. Munoz-Garcia*, 455 F. Supp. 3d 915, 918 (D. Ariz. 2020).

Here, two constitutional rights – those under the Fifth and Sixth Amendments – are implicated by failure to house Mr. Turner in a more reasonably accessible detention facility. The Fifth Amendment provides that "no person shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. *See United States v. Resendiz-Guevara*, 145 F. Supp. 3d 1128, 1137 (M.D. Fla. 2015) ("The Fifth Amendment right to due process guarantees that a criminal defendant will be treated with 'that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.'" (quoting *United States v. Valenzuela–Bernal*, 458 U.S. 858, 872 (1982))).

The Sixth Amendment to the United States Constitution guarantees every accused person the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). A pre-

trial detainee's Sixth Amendment rights are infringed when prison regulations "unjustifiably obstruct," "infringe," "unreasonably burden," or "significantly interfere" with the detainee's access to counsel. *Osgood v. Amato*, No. 12–CV–565, 2013 WL 3777189, at *6 (N.D.N.Y. July 17, 2013). An inmate's right to counsel to assist in his defense during a criminal prosecution implicates "both the due process right of access to the courts and the Sixth Amendment right to counsel." *Alster v. Goord*, 745 F. Supp. 2d 317, 340 (S.D.N.Y. 2010). "To meet the requirements of due process, inmates must have a *reasonable* opportunity to seek and receive the assistance of attorneys." *Id*.

Mr. Turner has been housed at MDC Brooklyn for approximately 2 months. MDC Brooklyn is geographically over 200 miles from Boston. The drive to the facility from undersigned counsel's office is approximately four to five hours *one way*. Simply facilitating a visit to MDC Brooklyn, in light of defense counsel's other obligations in court, requires significant planning and expense incurred by the Federal Defender Office.[5]

However, getting to Brooklyn is not the only hurdle a defense attorney faces when trying to meet with a client at the MDC. The facility has had long-standing issues ranging from regular violence between detainees themselves and detainees and staff to notoriously poor medical care. *United States v. Chavez*, 710 F. Supp. 3d 227 (S.D.N.Y. 2024). Judge Furman has noted with respect to MDC Brooklyn, "It has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC. Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable." *Id*. at 229. Noting the conditions at MDC Brooklyn are "dreadful in

---

[5] At the current $.70 per mile personal vehicle reimbursement rate, the Federal Defender Office would expend $280-$350 per trip in mileage, to say nothing of lodging and per diem expenses.

many respects," Judge Furman specifically observed, ". . . inmates at the MDC spend an inordinate amount of time on 'lockdown' – that is, locked in their cells, prohibited from leaving for visits, calls, showers, classes, or exercise. (In Orwellian fashion, the Bureau of Prisons does not refer to these periods as 'lockdowns'; instead, it refers to them as 'modified operations.' . . . But there is no mistaking what the practice entails.)" *Id*. at 233. Further, ". . . the MDC is notoriously and, in some instances, egregiously slow in providing necessary medical and mental health treatment to inmates . . . It has become common for defense counsel to require court intervention to ensure that inmates receive basic care – and, even more shocking, not uncommon for court orders to go unheeded." *Id*. at 234. What's more, Judge Furman noted the physical conditions at MDC Brooklyn have long been problematic, with one example that as recently as January 2024, " . . . many, if not most, of the emergency call buttons in the MDC's main building are not working – even though these buttons are the only way (other than yelling and banging) to call an officer in emergency situations during a lockdown." *Id*. at 235-236.

Most importantly, for this Court's consideration, MDC Brooklyn has a history of struggles related to inconsistent and restrictive access to counsel and case-related material necessary to prepare for proceedings, including trials. In fact, attorney-access issues formed the initial basis of a complaint brought by the Federal Defenders of New York, Inc. against the Bureau of Prisons. *See Federal Defenders of New York, Inc. v. Federal Bureau of Prisons, et al*., 954 F.3d 118 (2d Cir. 2020). That matter remains pending with an appointed mediator and the parties filing regular status reports. *See Federal Defenders of New York, Inc. v. Federal Bureau of Prisons, et al.*, No. 1:19-cv-00660-MKB-PK (E.D.N.Y.). According to the most recent minute entry following a status conference on July 11, 2025, the plaintiffs reported several attorneys waiting for over 90 minutes

to see clients on July 2, 2025.[6] In the minute entry following a March 9, 2025 status conference, the mediator, Loretta Lynch, is noted to have informed the court that at an upcoming mediation, the parties would discuss "ensuring inmates on video calls have access to headphones because the plexiglass screens affixed to the equipment make audio during the calls challenging."

Defense counsel can schedule video calls with their clients at MDC Brooklyn, but must schedule the calls through the Federal Defenders of New York. There are a limited number of slots per day and the Federal Defenders office has no control over whether the calls and video conferences are actually provided. The status reports of the Federal Defender's lawsuit describe frequent technical issues surrounding calls as well.

At this point, undersigned counsel has not been able to visit Mr. Turner in person at MDC Brooklyn. Substantive phone and video calls are particularly challenging for counsel and for Mr. Turner due to Mr. Turner's serious mental health presentation and the concepts which must be discussed and reviewed together. Although Mr. Turner has been restored to competency, he is still an individual who requires extra time and care to ensure that he is fully comprehending the information from and advice of his attorney. This is especially so because Mr. Turner reports

---

[6] Notably, the status reports include other harrowing experiences, including one trial team experiencing a delay of three hours *after* it met with a client in a special access unit before being let out. The April 26, 2023 plaintiff's report noted, "Although current protocol requires that an officer conduct checks of the SAMs unit at thirty-minute intervals, no one came to check on the legal visitors between 12:30pm and 2:00pm. When no officer came at 2:00pm, the legal team buzzed to be released. They pressed the buzzer for 15 to 20 seconds at a time, every 20 minutes. By 3:00pm, Mr. Dalack realized he would not be able to pick up his children, and Mr. Khodjaev realized he would miss his childrens' promotion ceremony. Mr. Khodjaev repeatedly held up a sign that said "SOS" to the security camera; the client desperately needed to use the restroom. At 4:15pm, an officer quickly opened and shut the flap on the client's door and walked away before counsel could say anything. Counsel continued buzzing, banging on the door, and shouting. At 5:35pm, three hours and thirty-five minutes after they had requested to leave, an officer opened the door. When the trial team explained that they had been trying to leave since 2:00pm, the officer shrugged." *Id*. at ECF No. 375.

lockdown housing conditions since he arrived at Brooklyn (and indeed during his transit from Butner as well). Extra time and care is also vital to ensure that Mr. Turner can communicate to counsel all the information necessary to prepare his defense. Whereas for some clients, video calls and phone calls could adequately sustain an attorney-client relationship in the run-up to a trial, Mr. Turner's unique presentation and circumstances require detailed face-to-face communication.

In sum, Mr. Turner's unique personal circumstances must be accommodated with frequent in-person meetings, but the geographic obstacles and the myriad and long-standing issues at MDC Brooklyn have made those meetings practically impossible. As a result, Mr. Turner's rights to due process and effective assistance of counsel are not being upheld. Mr. Turner's constitutional rights have been violated, and the indictment against him must be dismissed as a result because of his apparently continued detention at MDC Brooklyn.

## II.     If the Court declines to dismiss the indictment, it should, in the alternative, issue an order compelling the U.S. Marshals Service to transfer Mr. Turner.

Although decisions regarding placement of pretrial detainees are typically within the Marshals' domain, the court can intervene when the circumstances of pretrial detention infringe upon a defendant's constitutional rights. *See, e.g., United States v. Savage*, No. CRIM.A. 07-550-03, 2012 WL 5866059, at *3 (E.D. Pa. Nov. 16, 2012) (ordering a federal detention center to provide visitations for defendant with his children, and finding: "To the extent that a prison condition affects Defendant's ability to prepare his defense in this criminal action, he may challenge the condition on the basis that it constitutes an impermissible restriction of a constitutional right."); *United States v. Poulsen*, No. CR02-06-129, 2008 WL 161328, at *1 (S.D. Ohio Jan. 15, 2008) (ordering, *inter alia*, the Marshals to "re-house" a white-collar defendant to a different facility "which is better suited … to accommodate [his] need to assist his counsel prepare for trial," and requiring certain modifications of the circumstances of his pretrial detention to

permit greater access to counsel and to voluminous discovery materials). *See also United States v. Rosnil Ortiz*, No. 1:22-cr-10257-NMG-1, ECF Nos. 57-63 (D. Mass. 2022) (Defendant housed at MDC Brooklyn after no facility would accept him for housing locally filed "Motion for Pretrial Detention in the District of Massachusetts"; after a motion hearing and subsequent status conferences totaling approximately 45 days, Hartford Correctional Center accepted the defendant and the matter proceeded to trial.).

As detailed above, Mr. Turner's constitutional rights to due process and effective assistance of counsel are violated by his placement at MDC Brooklyn. It is simply not feasible for defense counsel, who practices in the District of Massachusetts and who has a Massachusetts residence, and personal and professional obligations in Massachusetts, to travel back and forth to Brooklyn, New York in order to prepare for Mr. Turner's trial. Considering Mr. Turner's history of serious mental health issues, defense counsel needs in-person time with Mr. Turner to prepare for trial in an ethical and constitutionally sufficient manner. The current obstacles are an unconstitutional impediment to Mr. Turner's access to his lawyer. If this Court does not dismiss the indictment against Mr. Turner, it should, in the alternative, issue an order compelling Mr. Turner's transfer to a more reasonably accessible facility within Massachusetts, Rhode Island, Connecticut, New Hampshire, or Maine.

## CONCLUSION

Mr. Turner's placement at MDC Brooklyn has had a profound impact on his ability to prepare for trial. For the reasons stated above, this Court should dismiss the indictment or, in the alternative, issue an order compelling Mr. Turner's transfer to a detention facility within Massachusetts, Rhode Island, Connecticut, New Hampshire, or Maine.

Mr. Turner respectfully requests a hearing on his motion.

      Undersigned counsel has broadly discussed this filing with the government, and anticipates that the government will seek the opportunity to file its written response consistent with Local Rule after accommodating pre-planned personal leave, to which Mr. Turner would assent.

      Respectfully submitted,
JERMONE TURNER
By His Attorney,

*/s/ Brendan Kelley*
Brendan Kelley
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
Tel: 617-223-8061
Brendan_Kelley@fd.org

## CERTIFICATE OF SERVICE

      I, Brendan Kelley, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on August 5, 2025.

*/s/ Brendan Kelley*
Brendan Kelley